UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA DESANDRE and
ROBERT DESANDRE,

       Plaintiffs,

v.

COUNTY OF OSCODA,
GARY COLE,
KEVIN GRACE,
CASANDRA MORSE-BILLS, and
KRISTI MCGREGOR,

       Defendants.

Case No. 20-12209
Honorable Laurie J. Michelson
Magistrate Judge Patricia T. Morris

---

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [53]

---

"Good fences make good neighbors." Not so, apparently, with sheds. Tina and Robert DeSandre and Brenda Oates are next-door neighbors. Near their shared property line stood an old, rundown shed. Oates believed that the shed was on her side of the line. The DeSandres believed just the opposite. And they wanted to take down the shed and construct a garage and driveway in its place.

By August 31, 2018, the neighbors had had enough. That day, Tina tried to obtain a personal protection order against Oates. And Oates called the Oscoda County Sheriff's Office to complain about the DeSandres. According to Deputy Gary Cole, he saw the DeSandres, with the assistance of someone they had hired, tearing down the shed. Cole asked his supervisor, Oscoda County Sheriff Kevin Grace, to come to the scene. The DeSandres explained to both Cole and Grace that they had used a

neighbor's land survey to determine the property line and that they were certain that the shed was on their property. Not fully convinced that the DeSandres had the right to dismantle the shed, Cole submitted his report of the day's events to the Oscoda County Prosecutor at the time, Casandra Morse-Bills.

Largely based on the information contained in Cole's report, Morse-Bills decided to charge the DeSandres with malicious destruction of personal property, a felony. In support of warrants for the DeSandres' arrest, a sheriff (not Cole) prepared an affidavit using Cole's report. A magistrate reviewed the affidavit and issued the warrants. The DeSandres spent part of a day in jail before being released on bond. Later, Kristi McGregor became the Oscoda County Prosecutor and continued to prosecute the DeSandres. In the end, a judge dismissed the charges.

Cleared of wrongdoing, the DeSandres filed this lawsuit against Cole, Grace, Morse-Bills, McGregor, and Oscoda County. Among their four counts, the DeSandres claim that Defendants falsely arrested them in violation of the Fourth Amendment. The parties discovered what they could about what happened, and now Defendants ask the Court for summary judgment on all counts.

The Defendants' motion will be granted. Although the prosecutor and magistrate relied on information in Cole's report to seek and issue arrest warrants (respectively), no reasonable jury could find that Cole recklessly made misrepresentations in his report. So Cole is not liable for the DeSandres' arrest. And Grace did not provide the prosecutor or magistrate with any information that was relied on to seek or issue the warrants, so he is not liable for false arrest either. As

for the two prosecutors, they are immune from suit. For these and other reasons provided below, summary judgment is warranted.

## I. Background

### A. Facts

### 1.

In 2016, Tina and Robert DeSandre purchased a 198-by-198-foot property in Comins Township, Michigan. (ECF No. 53-5, PageID.550.) They planned to fix up an existing structure on the property and make it their retirement home. (*Id.*) Immediately to the south of the DeSandres' property was the Fredericks' property; immediately to the north of the DeSandres' property was Brenda Oates' property. (ECF No. 53-5, PageID.551–552.) The three properties lined a north-south road, Perry Creek Road, in roughly the following manner (the size of the properties are not to scale):



An old shed stood near the line dividing the DeSandres' property from Oates'. The shed had been there for decades, perhaps since 1993. (ECF No. 53-6, PageID.594.) Oates stored her things in the shed, including a four-wheeler and a snow blower. (ECF No. 53-6, PageID.581.) Around the time of the events giving rise to this suit, the shed was in poor condition:

 

(ECF No. 59-15, PageID.1076, 1077.)

At some point (perhaps in July 2018), the DeSandres set out to find the line between their property and Oates'. Although not perfectly clear from the record, it appears that the DeSandres determined the property line as follows: their title showed that they owned 198 feet along Perry Creek Road (which ran north-south); the State of Michigan had placed a survey marker at the Frederick-DeSandre property line and the Fredericks had obtained a survey of their property; so using the

Fredericks' survey and that marker, Robert measured 198 feet north along Perry Creek; after 198 feet, he determined that to be the boundary of the DeSandres' property and Oates'. (*See* ECF No. 53-5, PageID.561; ECF No. 53-4, PageID.513–514, 540; ECF No. 59-11, Video at 1:10 to 1:13 (Robert explaining to Grace or Cole that "an official survey from next door, he had his survey, I measured my 198 over").) Apparently confirming that the DeSandres' method was accurate, there was a second survey marker 198 feet north from the DeSandre-Frederickson line. (*See* ECF No. 53-4, PageID.539–540.) This, apparently, marked the DeSandre-Oates line.

In the spring of 2017, the DeSandres showed Oates the property line. Oates acknowledged that the shed was on the DeSandres' property and asked if she would get in trouble for the "garbage" or junk in and around the shed. (ECF No. 53-5, PageID.562.) The DeSandres indicated that they would take care of the garbage. (ECF No. 53-5, PageID.562.) And in the summer of 2017, Oates removed her remaining belongings from the shed. (ECF No. 53-5, PageID.562.)

Things were neighborly enough for a time.

## 2.

In July 2018, the DeSandres were preparing to build a garage, driveway, and fence between their property and Oates'. (ECF No. 53-4, PageID.513, 526.) To indicate where the fence would go, Robert ran a neon string from the marker at the DeSandre-Oates line to the back of the property. (ECF No. 53-5, PageID.577; ECF No. 53-4, PageID.513, 539–540; ECF No. 59-11, Video at 0:50 to 1:15 (showing neon string).)

With the string in place, it was apparent that the entire shed was a few feet into the DeSandres' property. (ECF No. 53-4, PageID.539–540.)

During July and August 2018, things escalated between Oates and the DeSandres. The DeSandres were moving forward with their plan for a garage and driveway by cleaning up the garbage or junk around the shed and clearing trees. (ECF No. 53-4, PageID.512.) This, apparently, increased the tension between the neighbors. Robert recalls Oates hiring an attorney and trying to force the DeSandres to sell her the land where the shed was located for one dollar. (ECF No. 53-4, PageID.529.) According to Robert, Oates threatened that "if we didn't sell it to her for a dollar we were going to pay, they were going to burn our house down." (ECF No. 53-4, PageID.512.) Tina also recalls Oates making similar threats. (ECF No. 53-5, PageID.556.) For her part, Oates recalls Tina yelling, swearing at her, and threatening to burn down the shed. (See ECF No. 59-19, PageID.1106; ECF No. 53-6, PageID.585.)

### 3.

Things reached the boiling point on August 31, 2018.

On the morning of August 31, the DeSandres decided to seek a personal protection order against Oates. While they were at the library completing the forms for the PPO, they received a call from Gregory Tuttle. (ECF No. 53-5, PageID.557.) The DeSandres had hired Tuttle to help with construction, and, on the morning of August 31, he was cleaning up their property. (ECF No. 53-5, PageID.557, 563.) Tuttle informed the DeSandres that a sheriff was at their house. Apparently, Oates

had called the sheriff when she saw Tuttle cleaning up. (*See* ECF No. 59-17, PageID.1087.)

When the DeSandres got home from the library, Tina spoke with Gary Cole, a deputy with the Oscoda County Sheriff's Office. Tina recalls showing Cole the property line and the survey markers and providing Cole with paperwork, including the description of their property and title insurance. (ECF No. 53-5, PageID.559, 576; ECF No. 53-4, PageID.540.) In his report of the morning's visit, Cole wrote, "Tina Desandre reports that her neighbor, Brenda Oat[e]s, is harassing her, due to a dispute the two of them are having over the property line. The issue is an old shed on the property[.]" (ECF No. 59-17, PageID.1084.) Cole recalls, "I basically told the two parties that they would have to resolve the issue in civil court regarding the property line and who . . . had authority over the shed." (ECF No. 53-7, PageID.612; *see also* ECF No. 53-6, PageID.584; *but see* ECF No. 53-4, PageID.540.)

After Cole's morning visit, Robert and Tuttle continued to clean up, including by removing some "garbage" around the shed. (ECF No. 53-5, PageID.563; ECF No. 53-4, PageID.516.) Apparently, this prompted Oates to call the sheriff's office again. Cole returned to the scene. (ECF No. 59-17, PageID.1087.) In time, Cole asked his supervisor, Oscoda County Sheriff Kevin Grace, to come to the scene.

Once Grace arrived, the DeSandres repeated the process they had been through with Cole earlier in the day: they showed Grace the survey markers and provided him with the Fredericks' survey and other paperwork. (ECF No. 53-5, PageID.561, 563, 576; ECF No. 53-4, PageID.514, 540.) Grace also saw the neon

string demarcating the line between the properties. (ECF No. 53-9, PageID.628.) And while it is not clear if it was before or after Grace arrived, the DeSandres again showed Cole the survey markers and paperwork; Cole may have seen the neon string too. (ECF No. 53-4, PageID.526; ECF No. 53-5, PageID.577.) Robert recalls, "I told Sheriff Grace that I wasn't guessing about whether or not it was my property, that I knew it was, and he told me that he was going to go back pretty much and find something to arrest me for[.]" (ECF No. 53-4, PageID.511, 516.) According to Robert, "[Grace] was going to go back and consult with [Oscoda County Prosecutor] Morse-Bills about finding a reason to arrest us." (ECF No. 53-4, PageID.524; *see also id.* at PageID.511.) Tina likewise recalls, "Grace told my husband he was going to go to the prosecutor and find something to arrest him for." (ECF No. 53-6, PageID.564.)

Robert also maintains that he made no modifications to the shed until Grace and Cole left. (ECF No. 53-4, PageID.518, 537.) Robert recalls that after Cole's first visit, he and Tuttle merely cleaned up "garbage" around the shed. (ECF No. 53-4, PageID.516.) But, says Robert, the sheriffs had directed that Oates should be allowed to remove her belongings from the shed. And when the sheriffs left for the second time, "[Oates] said she was going to go in the shed, slip and fall and hurt herself and sue me like she sued the BP and own my house." (ECF No. 53-4, PageID.516.) (Although the record does not say, the "BP" may have been a gas station.) So, says Robert, he "made it safe" by "[bringing] the roof down to a safe structure so nobody could enter the shed anymore." (ECF No. 53-4, PageID.509, 518, 537.)

Cole and Grace have a different account.

8

First, although Robert recalls making the shed safe only after the sheriffs left for the day, Cole recalls that when he arrived on scene the second time, the shed was "basically demolished" with the west side having been "ripped down." (ECF No. 53-7, PageID.607.) In fact, Cole's report from shortly after the visit states that he "observed [Robert], [Tina], and [Tuttle] . . . taking the shed apart and tearing it down." (ECF No. 59-17, PageID.1087.)

Second, although Robert recalls Grace saying that he was going to "find" something to arrest him for, Grace recalls, "I would have said that the matter will be reviewed with the prosecuting attorney's office and at that point it will be determined whether or not there will be charges pressed." (ECF No. 53-9, PageID.628.) And Cole recalls, "[Grace] indicate[d] that now that you've destroyed the shed, we will have to forward this to the prosecutor for a review because Mrs. Oat[e]s wanted to file a complaint that her shed had been taken down without her permission." (ECF No. 53-7, PageID.613.)

On this much the parties agree: on August 31, neither Grace nor Cole arrested the DeSandres.

### 4.

A few days later, on September 4, 2018, Oates obtained a land survey. (ECF No. 53-6, PageID.589.) Just as the DeSandres had claimed all along, the survey showed that the shed was on their property. (*See id.*) The DeSandres assert (with questionable evidentiary support) that on September 4, 2022, or very shortly after,

Oates called Cole to tell him that the shed was, in fact, on the DeSandres' property. (ECF No. 59, PageID.815.)

**5.**

On September 5 and 6, 2018, Casandra Morse-Bills, the Oscoda County Prosecutor at the time, signed warrant requests for Tina and Robert. (ECF No. 53-2, PageID.492, 495.) Because it is key to assessing the DeSandres' legal claims, the Court details how Morse-Bills decided to pursue charges against the DeSandres.

According to Morse-Bills, in the normal course, a "requesting officer would submit a warrant request with any charges that they were requesting." (ECF No. 53-14, PageID.686.) She would then review "the warrant request, the statement in support, as well as any police report or accompanying exhibits or documents that were submitted with that request." (*Id.*; *see also* ECF No. 53-14, PageID.690.) She would then decide "what charges are appropriate." (*Id.*)

In this particular case, it appears that the sheriff's department submitted at least two documents to the prosecutor's office: Cole's August 31, 2018 report of the events of that day and an affidavit prepared by another sheriff. (*See* ECF No. 53-7, PageID.601; ECF No. 53-14, PageID.686, 690.)

Take Cole's report first. In part, it stated that Oates had assumed the shed was on her property because it had been there since she had bought the home in 1993, that the DeSandres had a survey (the Fredericks' survey) and that upon measuring the property, "they ha[d] determined that the property line is approximately 20 feet into Oat[e]'s property, and directly within this area is the shed in question," and that

10

when he returned for the second time, he saw the DeSandres and Tuttle "taking the shed apart and tearing it down." (ECF No. 59-17, PageID.1087.)

As for the affidavit, it was not signed by Cole and appears to have been prepared by a sheriff who relied on Cole's report. In part, the affidavit stated the following: (1) "Robert Desandre maintained that he had a property survey and he had mea[]sured the property; and that the shed in question was actually over his property line," (2) "[u]pon arriving [the second time] Dep. Cole observed that approximately half of the shed had been torn down," (3) "Robert DeSandre and Tina Desandre . . . continued to tear the shed apart in the presence of Dep. Cole and Sheriff Grace," and (4) "Cole obtained an estimate of the value of the shed from the Home Depot website." (ECF No. 53-2, PageID.496.)

The DeSandres maintain that when Morse-Bills was deciding whether to pursue charges, she also had Oates' September 4 survey showing that the shed was on their property.

Having reviewed Cole's report and the affidavit, and possibly Oates' survey, Morse-Bills—knowing either that there was a dispute over whose property the shed was on or that it was on the DeSandres' property—elected to charge the DeSandres with malicious destruction of personal property, with the amount of damage being at least $1,000 but less than $20,000. This was a felony charge. It appears that Morse-Bill's office filled out the forms for criminal complaints and for arrest warrants and submitted them to a state magistrate. (ECF No. 53-14, PageID.690; *see* ECF No. 53-2, PageID.492, 495; ECF No. 53-10, PageID.641–642.)

11

On September 12, 2018, the magistrate signed the complaints and warrants. (ECF No. 53-2, PageID.492, 495; ECF No. 53-10, PageID.641–642.)

## 6.

Meanwhile, Oates had sought a personal protection order against Tina. (ECF No. 59-18.)

A hearing on the PPO was held in October 2018. Kristi McGregor, an attorney who Oates had retained prior to the events of August 31, represented Oates at the PPO hearing. (ECF No. 53-6, PageID.593; ECF No. 59-10, PageID.1008.) Soon after the October 2018 PPO hearing, McGregor became an Assistant Oscoda County Prosecutor. (ECF No. 53-16, PageID.727; ECF No. 53-15, PageID.708.)

The hearing on the PPO was in the morning, and after the hearing, the arrest warrants for the destruction-of-personal-property charges were executed. Both Tina and Robert were arrested. Neither Grace nor Cole were the arresting officers. Tina and Robert each spent around five hours in jail before being released on bond. (*See* ECF No. 53-11, PageID.644, 646.)

## 7.

About six months later, in April 2019, the DeSandres' had their preliminary examination, i.e., probable-cause hearing, on the malicious-destruction-of-personal-property charges. By this time, Morse-Bills had been elevated to a judge (though not the judge presiding over the DeSandres' criminal case), and McGregor, who had represented Oates at the PPO proceeding, had become the Oscoda County Prosecutor.

At the preliminary examination, McGregor argued that there was probable cause for the charges. (ECF No. 53-13, PageID.676–677.)

A state district judge agreed: "The testimony from Mrs. Oates is that she actually witnessed the defendants tearing down the shed . . . . [W]hile it may have turned out that the shed was on the [DeSandres'] property, the shed belonged . . . to Ms. Oates until some determination was made by a court that it was no longer her property." (ECF No. 53-13, PageID.678.)

But in July 2019, a state circuit judge dismissed the charges against the DeSandres. Based on evidence that the shed was affixed to the land, the circuit judge found that no *personal* property had been destroyed. (ECF No. 59-23, PageID.1144.)

## B. Procedural History

Having been cleared of criminal charges, the DeSandres filed this civil suit. The DeSandres named Cole, Grace, Morse-Bills, McGregor, and the County of Oscoda as defendants.

The DeSandres' amended complaint has four counts. Count I is under the Fourth Amendment: the DeSandres claim that Defendants "falsely arrested and falsely detained [them] without probable cause or exigent circumstances" (ECF No. 35, PageID.270.) In Count II, the DeSandres allege that Defendants violated the First Amendment: they maintain that Defendants charged, arrested, and prosecuted them because of what they said to Cole and Grace when the two sheriffs were at the scene. (*Id.* at PageID.272.) Count III is a civil-conspiracy claim; the DeSandres assert that Cole, Grace, Morse-Bills, and McGregor agreed to pursue false charges against them.

(*Id.* at PageID.273.) Finally, the DeSandres bring a claim directly against Oscoda County under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). (*Id.* at PageID.274.)

Following discovery, Defendants seek summary judgment on all four counts. (ECF No. 53.)

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## III. Analysis

## A. Fourth Amendment Claims

The Court begins with the DeSandres' claim that the two sheriffs and the two prosecutors violated the Fourth Amendment by "falsely arrest[ing] and falsely detain[ing] [them] without probable cause or exigent circumstances." (ECF No. 35, PageID.270.) The Court starts with the two sheriffs, Grace and Cole, and then turns to the two prosecutors, Morse-Bills and McGregor.

### 1. Sheriff Grace and Deputy Cole

Both sides focus on whether Cole and Grace had probable cause (or, after factoring in qualified immunity, arguable probable cause) to arrest the DeSandres.

But given the facts, a different legal framework applies. Neither Cole nor Grace arrested the DeSandres. Moreover, while Cole submitted a police report to the prosecutor's office and another sheriff submitted an affidavit and warrant request to the prosecutor's office, it was Morse-Bills who authorized the warrant request. And

14

it was a magistrate who ultimately decided that warrants for the DeSandres' arrest should issue.

Given these facts, the question is not whether Cole or Grace had probable cause to arrest the DeSandres, but whether they made false statements that led to the DeSandres' arrest. More precisely, because their "arrest was made based on a facially valid warrant approved by a magistrate," to hold Cole or Grace liable for false arrest, the DeSandres must show that they "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Trakhtenberg v. Cnty. of Oakland*, 661 F. App'x 413, 419 (6th Cir. 2016) (quoting *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)); *accord Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 635 (6th Cir. 2020) (applying reckless-disregard standard to false-arrest claim).

But what does it mean to "knowingly and deliberately, or with a reckless disregard for the truth, ma[k]e false statements or omissions"? In adopting this standard, the Sixth Circuit relied on *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000). *See Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citing *Wilson*); *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015) (using *Wilson*'s reckless-omission standard). Under *Wilson*, assertions are "made with reckless disregard when viewing all the evidence, the [officer] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." 212 F.3d at 788 (internal quotation marks omitted). As for omissions, those

are made with reckless disregard if the defendant officer withholds information, but "any reasonable person" would have known that the magistrate would have wanted that information. *Id.*

Here, no reasonable jury could find that Grace, with a reckless disregard for the truth, made false statements or omissions that were material to the prosecutor or the magistrate finding probable cause. Grace was simply not involved in the submissions to the prosecutor's office or to the magistrate. He did not author a report about the events of August 31. (*See* ECF No. 59-17, PageID.1087; ECF No. 53-9, PageID.630.) And he was not the affiant for the complaint or warrant application. (ECF No. 53-2, PageID.493, 496; ECF No. 53-9, PageID.630.) As Grace says, "I wasn't the investigating officer." (*See* ECF No. 53-9, PageID.628.)

Resisting this conclusion, the DeSandres stress that while at the scene, Grace said that he was going to "go back and find something to arrest" to arrest Robert for or that he was going to "go back and consult with Morse-Bills about finding a reason to arrest us." (ECF No. 53-4, PageID.516, 524, 564.)

But even if that is what Grace *said*, the evidence strongly suggests that is not what he *did*. Grace maintains that before the warrant issued, he never met with Morse-Bills about the events of August 31 and never spoke with her about whether the DeSandres were legally justified in taking down the shed. (ECF No. 53-9, PageID.631, 634.) And Morse-Bills says she never had any discussion about the DeSandre matter before the warrant issued. (ECF No. 53-14, PageID.686.) Further, as discussed, Grace did not prepare the sheriff's report and was not the affiant for the

16

warrant. So even fully crediting what the DeSandres recall Grace saying at the scene, no reasonable jury could find Grace provided Morse-Bills or the magistrate with any information (let alone false information) that led to the issuance of the arrest warrants. Thus, the DeSandres' false-arrest claim against Grace fails as a matter of law.

What about Cole? Unlike Grace, Cole did prepare a report that Morse-Bills reviewed when she was deciding whether to seek arrest warrants. (ECF No. 53-14, PageID.686.) Further, it appears that Cole's report was the sole or, at least, primary factual basis for the affidavit in support of the warrants. And it was that affidavit that the magistrate relied on to issue the arrest warrants. But Cole's report does not support a claim for false arrest against him. Having reviewed the record, the Court is not persuaded that a reasonable jury could find that Cole recklessly gave a false impression that led to the prosecutor's or the magistrate's finding of probable cause.

First consider the elements of the crime. The DeSandres were charged with malicious destruction of personal property with the amount of destruction being at least $1,000 but not more than $20,000. *See* Mich. Comp. Laws § 750.377a. That crime consists of five elements: (1) "the property at issue belonged to someone other than the defendant"; (2) "the defendant destroyed or damaged the property"; (3) "the defendant did so willfully and maliciously, and with the intent to destroy or damage the property;" (4) the damage was at least $1,000 and less than $20,000, and (5) the property was personal (and not real). *See* Mich. Comp. Laws § 750.377a; *People v. Williams*, No. 297645, 2011 WL 2586267, at *1 (Mich. Ct. App. June 30, 2011).

17

Now consider Cole's report. His report included both inculpatory and exculpatory information about those elements. Cole's report started with Oates' account, including that she had "alleged" that the DeSandres "were trespassing on her property and demolishing her shed without permission." (ECF No. 59-17, PageID.1087.) Cole then recounted the DeSandres' side of the story, including that they had relied on the Fredericks' survey (which Cole called the "J. Card" survey) and that they had measured based on that survey. (*Id.*) Cole wrote, "[the DeSandres] have determined that the property line is approximately 20 feet into Oat[e]s' property, and directly within this area is the shed in question." (*Id.*) Cole further indicated that Oates had not had her property surveyed and had "assumed" that the shed was on her property. (*Id.*) Cole further noted that there was a marker that would support Oates' line, but that Robert had said that the marker was just an old pipe stuck in the ground. (*Id.*) Cole then included a drawing capturing the two sides' positions:



(ECF No. 53-8, PageID.623; ECF No. 59-17, PageID.1088.) Thus, Cole's report quite fairly presented both sides' positions on who owned the shed. As for the destruction aspect of the crime, Cole wrote that when he arrived on scene the second time, he saw the DeSandres (and Tuttle) tearing the shed down. (ECF No. 59-17, PageID.1087.) In all then, Cole fairly reported the information bearing on the crime of malicious destruction of personal property.

Because the DeSandres have used the probable-cause framework, they do not directly argue that Cole recklessly conveyed false information to the prosecutor or magistrate. But the DeSandres' brief makes apparent that had they used the proper framework, they would have made that argument. Indeed, for every one of the five elements of malicious destruction of personal property, they say that Cole did not have probable cause to believe that the element was met. (ECF No. 59, PageID.827–832.) Implicitly then, the DeSandres maintain that to the extent Cole's report provided facts supporting a finding of probable cause on a particular element, it could not have been truthful. Thus, the DeSandres' arguments about probable cause can be retrofitted to arguments about giving the magistrate a false impression. But even doing so, the Court finds the DeSandres' arguments unpersuasive. The Court's explanation tracks the five elements of malicious destruction of personal property.[1]

---

[1] The Court is doing its best to track the parties' arguments. It recognizes, however, that "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 582 (6th Cir. 2003). The relevant question is whether the "facts and circumstances within the officer's knowledge" were "sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is

*Personal Property*. Focusing on the "personal" property element, the DeSandres argue that "[t]he shed was a permanent, nonmovable, building attached to a foundation on [their] property." (ECF No. 59, PageID.828.) The DeSandres' point is that the shed was clearly affixed to their land, and clearly real property. And having reviewed Cole's report, it does not say whether the shed was affixed to their land. So, adapting the DeSandres' probable-cause argument, their position is that Cole recklessly gave the magistrate (or prosecutor) the false impression that the shed was personal property. *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000).

There are a few problems with this argument. To start, little suggests that Cole was aware—or even should have been aware—that the shed was affixed to the land. The DeSandres say photos make it obvious that the shed was affixed to the land. (ECF No. 59, PageID.829.) But the Court has reviewed the referenced photos (and the video), and it is not blatantly obvious that the shed was affixed. (*See* ECF No. 59-15, PageID.1075–1079.) So although Cole did not include in his report that the shed was affixed to the land, it is doubtful that his omission was in reckless disregard to information known to him.

But there is a second reason that Cole was not reckless. Even assuming that he knew the partially destroyed shed was affixed to the land, it was not unreasonable for him to omit that fact from his report. To be sure, personal property is an element of malicious destruction of personal property. But Michigan law separately

_____

committing or is about to commit an offense." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 362 (6th Cir. 2013).

criminalizes malicious destruction of numerous types of property: "personalty," Mich. Comp. Laws § 750.377a; "dam, reservoir, canal, trench," § 750.378; "fences or opening gates," § 750.381; "trees, shrubs, grass, turf, plants, crops, or soil," § 750.384; "machinery and appliances," § 750.386; and "house, barn or building of another," § 750.380—among others. So a reasonable officer could think that if he conveyed to the prosecutor and magistrate a description of the property that was destroyed (here a shed), it would then be for the prosecutor and magistrate to figure out the specific crime. In fact, Cole testified that the distinction between real and personal property would be something for the prosecutor to decide. (ECF No. 53-7, PageID.607–608.)

True, the affiant for the warrant likely knew that the charge involved personal property. The warrant affidavit "affirm[ed] the complaint," and the complaint, in turn, specifically charged "malicious destruction of *personal* property." (ECF No. 53-2, PageID.495–496.) So it would be fair to say that the affiant knew personal property was an element of the crime. So perhaps the affiant should have included information about whether the shed was affixed to the land. But the affiant was not Cole. (ECF No. 53-2, PageID.496.)

In short, the evidence does not make it obvious that the shed was affixed to the land, and so Cole's omission of that fact from his report was not reckless. And even assuming that Cole knew that the shed was affixed, no reasonable jury could find that all reasonable officers would have conveyed that fact to the prosecutor or magistrate. *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). So Cole was also not reckless for this alternative reason.

*Belongs to Another*. Turning to another element of the offense, the DeSandres argue that they did not damage someone else's property; they say that the shed "belonged wholly" to them and that "Defendants were aware of this fact." (ECF No. 59, PageID.830.) The DeSandres point out that when Cole was on scene on August 31, they gave him the Fredericks' survey, they explained that they had determined the property line using that survey, and they showed Cole survey markers placed by the State of Michigan. (*Id*.) In contrast, Oates provided Cole with no documentation to substantiate her claim that the shed was on her property. (*Id*.) Moreover, the DeSandres claim that after obtaining her September 4 survey, Oates informed Cole (and the prosecutor's office) and effectively conceded that the shed was on the DeSandres' land. (ECF No. 59, PageID.815, 817.) In all, the DeSandres imply that Cole turned a blind eye to the overwhelming evidence that the shed belonged to them. (*See* ECF No. 59, PageID.830.)

Even granting that Oates admitted to Cole that the shed was on the DeSandres land, the evidence the DeSandres' cite does not show that Oates did so before the magistrate issued the arrest warrants on September 12, 2018, i.e., the cited evidence does not show that Cole knew of Oates' concession at a time when he could have stopped the warrants from issuing. The DeSandres cite Oates' preliminary-examination testimony to show that she informed Cole of the survey results on or shortly after September 4, 2018. (ECF No. 59, PageID.817 (citing "Ex. K, pp. 24-25").) But the question posed to Oates at the preliminary examination was whether she "ever" informed Cole of the results of her survey—not whether she did so on or shortly

22

after September 4. (ECF No. 53-13, PageID.671–672.) The DeSandres also rely on Oates' deposition testimony in this case to argue that Oates shared the results of her survey with the sheriffs or prosecutors soon after receiving them. (ECF No. 59, PageID.819.) But Oates' testimony on this issue is extremely convoluted and would not convince any reasonable jury that she shared her survey results with Cole on or soon after September 4. (*See* ECF No. 53-6, PageID.589–591.) The DeSandres also cite Cole's preliminary-examination testimony to argue that Oates informed him on or shortly after September 4 that a survey marker proved that the shed was on the DeSandres' property. (ECF No. 59, PageID.819, 830 (citing "Ex. K, p. 11").) But here is what Cole said: "[Q.] So you never received a call from [Oates] on September 4th regarding a survey that she had done? [A.] The only, I guess, I don't know if you would call it a survey. She indicated to me that there was a marker that had been there since she bought the house. . . . [T]here was no, like, documentation or paperwork that she gave me regarding the, the property being surveyed." (ECF No. 53-13, PageID.658.) It thus appears that Cole is referring to the marker he was shown on the day of, the one Robert referred to as just an old pipe. In all, a reasonable jury would not be persuaded that before the arrest warrants issued, Oates had informed Cole that she had been mistaken and that the shed was in fact on the DeSandres' property.

And even assuming that before the warrants issued, Oates had informed Cole that the shed was on the DeSandres' land, the DeSandres seem to argue that Oates also told the prosecutor that information before the warrants issued. They argue,

"Defendant Morse-Bills authorized these warrants after . . . Oates had called Defendant Cole on September 4, 2018, and acknowledged that the shed was not on her property." (ECF No. 59, PageID.815.) And then later in their brief, they say, "Oates testified that she provided a copy of her survey, which established again that the shed was located entirely on Plaintiffs' property, to Defendant Grace *and the prosecutor (which was Defendant Morse-Bills at the time)* after the survey was performed on September 4, 2018." (ECF No. 59, PageID.818.) If it is the DeSandres' position that Morse-Bills was aware of the new information provided by Oates before the warrants issued, then Cole's failure to pass along what he learned from Oates did not affect Morse-Bills' decision to seek a warrant.

Apart from the DeSandres' unsupported assertion that Oates told Cole on or shortly after September 4 that the shed was on their land, what remains of the DeSandres' argument is that on the day he responded to the scene, they gave Cole much stronger evidence than Oates that the shed was on their property. But on this front, Cole's report was quite accurate. He indicated in his report that the DeSandres had used a neighbor's survey to determine the property line. (ECF No. 59-17, PageID.1087.) He also wrote that "upon measuring the property," the DeSandres had "determined that the property line is approximately 20 feet into Oat[e]s' property, and directly within this area is the shed in question." (*Id.*) In contrast, "Oat[e]s stated that she has never had her property surveyed but always assumed that the shed was on her property, as it was there when she bought the home." (*Id.*) True, reading the report in the light most favorable to the DeSandres, Cole perhaps should have more

24

clearly indicated to the prosecutor that the DeSandres' evidence about the property line was more convincing than Oates'. But the standard is recklessness; and no reasonable jury could find that when Cole reported that it was unclear on whose land the shed sat, Cole "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (internal quotation marks omitted).

*Destroys or Injures.* Turning to another element of malicious destruction of personal property, the DeSandres argue that Cole did not have probable cause to believe they "destroyed or damaged" the shed. (ECF No. 59, PageID.830.) Indeed, Robert maintains that it was not until the sheriffs left for the day that he changed the structure of the shed. (ECF No. 53-4, PageID.518, 537.) And even then, he merely "made it safe" by lowering the shed's roof so that no one could enter and get injured. (ECF No. 53-4, PageID.509, 518, 537.) Adapting this argument to the giving-a-false-impression framework, the DeSandres effectively claim that in writing the following in his report, Cole recklessly disregarded the truth: "Upon arrival [the second time,] [I] observed [Robert, Tina, and Tuttle] . . . taking the shed apart and tearing it down. The shed was about half demolished when [I] arrived[.]" (ECF No. 59-17, PageID.1087.)

No reasonable jury could find that Cole wrote those statements while "entertain[ing] serious doubts as to [their] truth," *Wilson*, 212 F.3d at 788. Robert admits that before Cole's second visit, he and Tuttle removed "garbage" from around the shed. (ECF No. 53-4, PageID.516.) And Tina says that "[t]here was garbage

25

holding up the siding of the shed." (ECF No. 53-5, PageID.563.) That assertion is supported by a picture from before August 31 (on the left) and one from August 31 (on the right):

 

(ECF No. 59-15, PageID.1075–1076.) If the shed looked like the picture on the left when Cole arrived the first time but then looked like the picture on the right when he arrived the second time, Cole had some factual basis to believe that the DeSandres had been, as he wrote, "taking the shed apart and tearing it down."

Dipositive, though, is a video of some of the events of August 31. The video shows Tuttle striking the shed with a sledgehammer three times and then removing a board. (ECF No. 59-11, Video at 0:00 to 0:10; *see also* ECF No. 59-9, PageID.1003.) The video also shows that the shed is missing an entire side and that a portion of another wall has also fallen down:



(ECF No. 59-11, Video at 0:10 to 0:14.) True, none of the photos from prior to August 31 show the entire shed. But it is also true that none of those photos show the shed in a state similar to that captured by the video. (*See* ECF No. 59-15, PageID.1076, 1078.) And two sheriffs, likely Cole and Grace, are shown in the video, meaning that the video was from Cole's second visit.

Although the summary-judgment standard typically requires that a plaintiff's account be fully credited, here the photos and the video show that the DeSandres altered the shed before Cole left for the day. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). And given the altered shed, no reasonable jury could find that Cole "entertained serious doubts as to the truth of his statements," *Wilson*, 212 F.3d at 788, when he wrote, "Upon arrival [the second time], [I] observed [Robert, Tina, and Tuttle] taking the shed apart and tearing it down. The shed was about half demolished when [I] arrived" (ECF No. 59-17, PageID.1087).

*Willfully and Maliciously*. In a related argument, the DeSandres claim that they did not act with the required intent to damage the shed. (ECF No. 59, PageID.831.) According to the DeSandres, "[their] testimony, which is supported by

the video evidence, established that to the extent they did anything to the shed, they only 'made it safe,' as opposed to destroying it." (*Id.*)

Even if the DeSandres' intent was merely to make the shed safe, the DeSandres have no evidence that Cole knew (or even should have known) that was their intent. Under the DeSandres' account, after Cole or Grace told them to let Oates remove her property from the shed, Oates made a threat about slipping and falling in the shed. So, say the DeSandres, they made the shed safe. But the DeSandres offer no evidence that Cole was aware of Oates' threat or aware that the reason the DeSandres lowered the shed's roof was to keep Oates safe. So even if Cole did not accurately portray the DeSandres' intent in his report, nothing suggests that his portrayal was reckless.

*Amount of Damage.* Finally, the DeSandres take issue with the amount-of-damage element. The DeSandres were charged with violating a provision of the malicious-destruction-of-personal-property statute requiring "[t]he amount of the destruction or injury" to be at least $1,000 but less than $20,000." Mich. Comp. Laws § 750.377a(1)(b)(i). Cole testified that after the warrant request was submitted to the prosecutor's office, someone from that office "brought to [his] attention" that it was necessary to have "a value for the property that ha[d] been destroyed." (ECF No. 53-7, PageID.601.) So Cole went on Home Depot's website and found out that it was $2,695 to buy a shed similar to the one at issue; this value was then included in the affidavit supporting the warrant request. (See ECF No. 53-2, PageID.496.) But, argue the DeSandres, "the amount of the destruction or injury" under § 750.377a(1) is not

the replacement cost of the shed. (See ECF No. 59, PageID.831.) Citing case law, the DeSandres say that the correct amount is either the decrease in the shed's value due to the damage or the cost of repairing the damage. (ECF No. 59, PageID.831.)

Even though Cole supplied the replacement cost instead of the decreased value or repair cost, no reasonable jury could find that Cole recklessly provided false information.

To start, false information was not provided to the magistrate. The affidavit states: "Dep. Cole obtained an estimate of *the value of the shed* from the Home Depot website, of a 12x16 wood shed, similar to that of [Oates'] destroyed shed, for an approximate value of $2695.00" (ECF No. 53-2, PageID.496 (emphasis added).) Thus, the affidavit merely stated that the estimated "value of the shed" was $2,695; it did not state that "the amount of the destruction or injury" was $2,695. So the statement in the affidavit was technically true.

And even if the statement was misleading, the DeSandres offer no evidence that all reasonable officers would have understood that the correct measure was either a decrease in the shed's value or the repair cost. In other words, the DeSandres have at most shown that Cole made a mistake, not that he was reckless.

In sum, the evidence would not persuade any reasonable jury that Cole misrepresented facts material to the prosecutor's or magistrate's decision to issue an arrest warrant; and even if a jury could be persuaded that some of the report gave the prosecutor or magistrate a false impression, the evidence would not permit a reasonable jury to find that Cole made those misrepresentations with reckless

disregard for the truth. *See Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 635 (6th Cir. 2020) (providing that "[i]f the arrest is made pursuant to a facially valid warrant," liability is proper only if the defendant made false statements or omissions "with a reckless disregard for the truth" (internal quotation marks omitted)). Accordingly, the DeSandres' false-arrest claim against Cole fails as a matter of law.

### 2. Prosecutor Morse-Bills and Prosecutor McGregor

The DeSandres' false-arrest claims against Oscoda County Prosecutor Morse-Bills and her successor, McGregor, can be addressed much more briefly.

Both Morse-Bills and McGregor engaged in traditional prosecutorial functions. Morse-Bills reviewed Cole's police report and decided to charge the DeSandres with malicious destruction of personal property. Then she (or someone in her office) submitted a complaint form and a warrant request for a magistrate's approval. And when McGregor took over as Oscoda County Prosecutor, she continued to prosecute the case against the DeSandres, including by appearing at their preliminary examination before the district judge and the subsequent hearing before the circuit judge. Because Morse-Bills and McGregor performed prosecutorial functions, they are both absolutely immune from a false-arrest claim arising out of those functions. *See Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 691 (6th Cir. 2020) (providing that prosecutorial immunity extends to "administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution," including "filing an information" and "participation in a probable cause hearing").

The DeSandres resist this result by pointing out that when a prosecutor gives legal advice to police officers, she is not immune to claims stemming from that advice. (ECF No. 59, PageID.821–822.) And, according to the DeSandres, Morse-Bills "provided legal advice as to the fact that Defendants Grace and Cole had probable cause to arrest [them]." (ECF No. 59, PageID.822.)

The evidence does not back the DeSandres' claim. True, the DeSandres testified that Grace said he was going to "go back and consult with Morse-Bills about finding a reason to arrest us." (ECF No. 53-4, PageID.516, 524, 564.) But as discussed, nothing suggests that Grace followed through on what he told Robert. Grace testified that before the warrant issued, he never met with Morse-Bills about the events of August 31 and never spoke with her about whether the DeSandres were legally justified in taking down the shed. (ECF No. 53-9, PageID.631, 634.) Grace did not submit a report to the prosecutor's office, nor was he was the affiant of the statement in support of the warrant. As for Cole, although he submitted his report to the prosecutor's office, he does not recall ever talking with Morse-Bills about the matter; Cole only recalled someone in the prosecutor's office asking him to supply a value for the destruction-of-property charge. (ECF No. 53-7, PageID.601, 608.) As for Morse-Bills, she was directly asked, "During August or September of 2018, did you give Grace or Cole any legal advice as to whether you thought charges could be brought against Robert and Tina Desandre?" Her answer: "No. I did not." (ECF No. 53-14, PageID.685.) So even if Grace told Robert that he was going to "go back and consult with Morse-Bills about finding a reason to arrest us," no reasonable jury could find

31

that Morse-Bills ended up providing legal advice to Grace and Cole about whether they had probable cause to arrest the DeSandres.

The DeSandres also argue that when a prosecutor investigates like a police officer, she is not absolutely immune to claims stemming from her investigation. And, according to the DeSandres, "McGregor was actively involved in the investigation due to the fact that she had represented Ms. Oates in the prior PPO hearing." (ECF No. 59, PageID.823.)

This argument is self-defeating. The DeSandres' efforts to avoid an absolute-immunity defense by pointing to McGregor's investigation when she was Oates' attorney runs headlong into the state-action requirement. The DeSandres' false-arrest claim stems from the Fourth Amendment. But the Fourth Amendment restrains government officials, not attorneys in private practice. *United States v. Miller*, 982 F.3d 412, 422 (6th Cir. 2020). True, McGregor did testify that even after she became the Oscoda County Prosecutor, she maintained a civil practice. (ECF No. 53-15, PageID.710.) But she was adamant that she did not work as a prosecutor at the time that she handled Oates' PPO. (ECF No. 53-15, PageID.709.) And documentary evidence supports her claim: it shows that McGregor was hired as assistant prosecutor after the PPO hearing. (*Compare* ECF No. 59-10, PageID.1006 (PPO hearing on Oct. 3, 2018), *with* ECF No. (prosecuting attorney "Hire Date: 11/13/2018").) Because McGregor did not engage in state action when she represented Oates, she cannot be liable under the Fourth Amendment for any investigation she performed as Oates' attorney.

32

In short, to the extent that the DeSandres seek to hold Morse-Bills and McGregor liable in their individual capacities for effectuating a false arrest, those claims are barred by absolute immunity.

But what about the DeSandres' false-arrest claims against Morse-Bills and McGregor in their official capacities? *See Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) ("Absolute immunity is a personal defense that is unavailable in an official-capacity action."). When "the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). So the DeSandres' official-capacity claims against Morse-Bills and McGregor are claims "against the entity." And, here, "the entity" is the State of Michigan, not Oscoda County: "county attorneys in Michigan . . . are responsible for enforcing criminal laws on behalf of the state." *Cady*, 574 F.3d at 343. Thus, the DeSandres' official-capacity claims against Morse-Bills and McGregor "should . . . be treated as a suit against the state." *Id.* And suits seeking monetary relief from a state are barred by sovereign immunity. *Id.* at 344.

The DeSandres do not dispute this law but argue that sovereign immunity does not apply because Morse-Bills and McGregor were engaged in police-like, not prosecutor-like, conduct. (*See* ECF No. 59, PageID.824.) But this effort to avoid sovereign immunity tracks their absolute-immunity arguments. (*See id.*) So it fails for reasons already given.

In sum, the DeSandres' Fourth Amendment claims against Morse-Bills and McGregor in their individual capacities are barred by absolute immunity and their Fourth Amendment claims against Morse-Bills and McGregor in their official capacities are barred by sovereign immunity.

## B. First Amendment Claims

The DeSandres also claim that Cole and Grace (and possibly Morse-Bills and McGregor too) violated their rights under the First Amendment. According to the DeSandres, they "voiced their opinion" to Cole and Grace "that they did not need to consult a civil attorney nor obtain a court order to take down a shed that was clearly and entirely located upon [their] property." (ECF No. 59, PageID.832.) For instance, Robert recalls, "I told Sheriff Grace that I wasn't guessing about whether or not it was my property, that I knew it was, and he told me that he was going to go back pretty much and find something to arrest me for." (ECF No. 53-4, PageID.511.) The DeSandres argue that when Cole first visited the property, he did not arrest them, but "after [they] disputed his opinion that they should not take down the shed until obtaining a court order regarding same, Defendant Cole returned, summoned his boss, Defendant Sheriff Grace, and suddenly determined that the matter was indeed criminal." (ECF No. 59, PageID.833.)

To prevail on a First Amendment retaliation claim, plaintiffs must establish a causal connection between their protected conduct and the defendant's retaliatory action. *Cunningham v. Blackwell*, 41 F.4th 530, 542 (6th Cir. 2022). At a minimum, the DeSandres must show that their protected conduct was "a substantial or

motivating factor" in Cole's decision to submit the matter to the prosecutor's office. *See Anders v. Cuevas*, 984 F.3d 1166, 1177 (6th Cir. 2021).

Here, the causal connection is lacking. According to the DeSandres, the "only" thing that changed between Cole's first and second visit "was [their] exercise of their constitutionally protected First Amendment rights[.]" (ECF No. 59, PageID.834.) But Cole's report states, "[I] . . . was later dispatched to the residence a second time, after [Oates] called to state the subjects were continuing to tear down her shed." (ECF No. 59-17, PageID.1087.) And Cole's report states that when he arrived the second time, he observed the DeSandres and Tuttle "taking the shed apart and tearing it down." (*Id.*) And, as explained, photos and video corroborate this statement in Cole's report. Thus, the DeSandres' speech was not the "only" thing that changed between Cole's visits. The condition of the shed changed. So no reasonable jury would be convinced that the DeSandres' speech—as opposed to their actions—motivated Cole to submit the matter to the prosecutor.

The DeSandres' First Amendment claim fails as a matter of law.

## C. *Monell* Claims

The DeSandres also seek to hold Oscoda County liable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Although they assert that Oscoda County failed to train or supervise its officers, they have not adequately developed that theory of municipal liability. (*See* ECF No. 59, PageID.835.) Instead, the DeSandres focus more on the "final decision-maker" theory of municipal liability. They argue that Grace held the top-level position of Oscoda

County Sheriff and that Morse-Bills and McGregor both held the top-level position of the Oscoda County Prosecutor at times relevant to this suit. (ECF No. 59, PageID.836.) And the DeSandres cite a case that states, "if a person responsible for making final decisions sets direction for a municipal entity, even if only in one instance that is not repeated, the municipal entity can be liable for the consequence of that decision," *Brooks v. Rothe*, No. 06-14939-BC, 2007 WL 3203761, at *7 (E.D. Mich. Oct. 31, 2007).

The final decision-maker theory of municipal liability does not fit the facts of this case. As already discussed, Grace had very limited involvement in the DeSandres' arrest and prosecution. He did not author a report and he did not swear out a warrant; he did not speak with the prosecutor before the warrant issued. As for Morse-Bills and McGregor, this Court has already explained that "county attorneys in Michigan . . . are responsible for enforcing criminal laws on behalf of the state." *Cady v. Arenac Cnty.*, 574 F.3d 334, 343 (6th Cir. 2009). Because Morse-Bills and McGregor "act[ed] as arms of the state—not of a municipality—when prosecuting state criminal charges," their "actions in prosecuting the charge . . . [may] not be attributed to the [municipality]." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (internal quotation marks omitted); *accord Gavitt v. Ionia Cnty.*, 67 F. Supp. 3d 838, 841 (E.D. Mich. 2014).

In short, even if Grace is a final decision-maker for purposes of municipal liability, he made no decisions that made any material difference to the DeSandres' arrest and prosecution. As for Morse-Bills and McGregor, their alleged conduct was

36

on behalf of the State of Michigan, not Oscoda County. So their decisions do not render Oscoda County liable.

### D. Civil Conspiracy Claim

The DeSandres also argue that Cole, Grace, Morse-Bills, and McGregor conspired to deprive them of their constitutional rights.

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (internal quotation marks omitted). For this claim to survive summary judgment, a reasonable jury must be able to find, among other elements, that "a single plan existed." *See id.*

The DeSandres have not directed the Court to evidence that Cole, Grace, Morse-Bills, and McGregor had a plan to unlawfully arrest or prosecute them. The DeSandres make this assertion: "the plan was for Defendants to abuse their positions of power to retaliate against Plaintiffs for failing to cow to Defendant Grace and Cole's erroneous opinion that Plaintiffs should waste the time and expense necessary to pursue a civil suit against Ms. Oates in order to determine what they already knew and the law provided—that the subject shed was located entirely on Plaintiffs' property." (ECF No. 59, PageID.835.) But in making this assertion, the DeSandres do not cite to the record. (*See id.*)

Moreover, contrary to any unlawful plan, the record reflects that the Oscoda County Sheriff's Department played its usual role and the Oscoda County Prosecutor's Office played its usual role. As explained, the evidence shows that Grace

did not discuss the DeSandre matter with Morse-Bills. (ECF No. 53-9, PageID.631, 634; ECF No. 53-14, PageID.686.) As for Cole, he submitted his report to Morse-Bills, and the evidence suggests they also did not discuss the matter. (ECF No. 53-7, PageID.601, 608; ECF No. 53-14, PageID.685.) Cole only recalls the prosecutor's office following up on the value for the destruction-of-property charge. (ECF No. 53-7, PageID.601–602.) A third sheriff prepared an affidavit based on Cole's report. Morse-Bills then reviewed the materials provided by the sheriffs, and then she decided whether to submit a warrant request to a magistrate. (ECF No. 53-14, PageID.686, 690.) Nothing about these steps suggest any type of unlawful plan.

Accordingly, no reasonable jury could for the DeSandres on their conspiracy claim.[2]

---

[2] A civil conspiracy claim requires a constitutional deprivation. *See Bauss v. Plymouth Twp.*, 233 F. App'x 490, 496 (6th Cir. 2007) ("To establish a 'conspiracy' under a Section 1983 claim, a plaintiff must first demonstrate a constitutional deprivation."); *PB&J Towing Serv. I & II, LLC v. Hines*, No. 20-6170, 2022 WL 390599, at *5 (6th Cir. Feb. 9, 2022) (similar). And as explained, no reasonable jury could find that Cole and Grace violated the DeSandres' First Amendment or Fourth Amendment rights. And, as also explained, Morse-Bills and McGregor are immune from claims that they violated the DeSandres' constitutional rights. So, arguably, the DeSandres' conspiracy claim fails for this second reason.

**IV.**

For the reasons given, the Court GRANTS Defendants' motion for summary judgment (ECF No. 53). The DeSandres' amended complaint (ECF No. 35) is DISMISSED WITH PREJUDICE.

SO ORDERED.

Dated: October 31, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE